10 So.2d 606

**BATON ROUGE BLDG. TRADES COUNCIL**
et al. v. T. L. JAMES & CO., Inc., et al.

No. 36489.

July 27, 1942.

Dissenting Opinion Aug. 6, 1942.

Rehearing Denied Nov. 4, 1942.

Durrett & Hardin, of Baton Rouge, and Barksdale & Barksdale, of Ruston, for defendants-appellants.

Bentley G. Byrnes, of New Orleans, and Wilbur D. Atkins and Jack P. F. Gremillion, both of Baton Rouge, for plaintiffs-appellees.

J. Thos. Jewell, of New Roads, amicus curiæ.

HIGGINS, Justice.

This is an action for specific performance of a contract. The defendants filed, in the alternative, with reservation of their rights, exceptions to the jurisdiction of the court ratione personae and ratione materiae, and of no right and no cause of action. The defendants also filed an answer denying that a contract had been entered into between the parties.

The district judge overruled the exceptions and granted judgment in favor of the plaintiffs, as prayed for. The defendants appealed.

Our appreciation and understanding of the law and the facts of this case both with reference to the exceptions and the merits are in accord with the views expressed by our learned brother below in two opinions, which we quote with approval:

On the Exceptions

"Now, the petition recites, in addition to other allegations of facts, the following:

"'Petitioners allege that on or about March 4, 1941, the Department of Highways of Louisiana, acting through its Director, Hon. W. Prescott Foster, signed and ratified a contract with a partnership of contractors, namely, T. L. James & Co., Inc., a private corporation organized under the laws of the State of Louisiana, domiciled in the Parish of Lincoln, Louisiana, and L. J. N. Keliher, doing business as the Keliher Construction Company, whom petitioners allege on information and belief and believes his domicile to be in the City of Dallas, State of Texas, but temporarily residing and doing business within the jurisdiction of the Honorable Court, for the erection of a certain highway bridge or project, known and designated and referred to as the "Morganza Floodway Project", —which contract calls for the erection of a bridge over Louisiana State Route No. 7 and over United States Route No. 190, to run from Lottie Louisiana, to the Atchafalaya River, all of which project is located in and lies within the Parish of Pointe Coupee, Louisiana.'

"'That the said T. L. James Co., Inc., and L. J. N. Keliher, doing business as the Keliher Construction Company, signed the contract above referred to as a partnership and became partners to fulfill the above-mentioned and described and numbered contract.

"'That on or after the signing of said contract, work was commenced by the contractors in the performance of said contract

and work is now being performed on said project, all in accordance with the terms of said contract.'

"The prayer of the petition in part reads as follows: .

" 'Petitioners further pray that a rule nisi issue herein directed to the defendants, T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Company, a partnership engaged in the construction of the Morganza Spillway Project, etc.' ·

"T. L. James & Co., Inc., and L. J. N. Keliher, and 'the alleged partnership of contractors namely T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Company', with the allegation that they were not in any way submitting themselves to the jurisdiction of the court, filed exceptions of a general nature reading as follows:

" 'This court is without jurisdiction "ratione personæ" over any of the respondents, which exception is hereby expressly pleaded.'

" 'And now reserving all rights under said exception "ratione personae" and in the alternative, and only in the event the said exception should be expressly overruled by this court, respondents further except to these proceedings for the reason that this court is without jurisdiction "ratione materiae" of the alleged cause of action proceeded upon.

" 'And now reserving all rights under said foregoing exceptions, and in the further alternative and only in the event both of said foregoing exceptions should be expressly

overruled by this court, respondent further excepts to these proceedings for the reason that the petition filed herein fails to disclose or allege a cause of action against any of the respondents, and fails to state a right or cause of action against any of these respondents.'

"No evidence was offered in connection with these exceptions and they were argued and submitted and the court took same under advisement, after certain reservations were made, the trial of the rule on its merits proceeded with the understanding that the court would render his decision on the exceptions prior to his passing on the merits.

"According to their brief counsel for exceptors base their plea or exception to the jurisdiction 'ratione Personae' on the contention (1) that Mr. L. J. N. Keliher was not cited and (2) that if defendants were sued as a partnership then there are no allegations in the petition showing that the partnership had but one establishment and that in the Parish of Pointe Coupee.

██ "As to the want of citation there is considerable jurisprudence to the effect that a want of citation is cured by the appearance of defendant in the suit for any other purpose than to allege want of citation. It is noted also that the prayer of the petition specifically seeks the issuance of a rule directed against T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Co., 'a partnership, etc.,' that the petition alleges that the said members of the partnership became partners for the purpose of fulfilling the contract concerning the project mentioned and

located in Pointe Coupee Parish and that work on said job had already begun. In other words, these allegations can be construed to mean only that said partnership had one establishment in this state and that it was located in the Parish of Pointe Coupee. Then the citation was directed to T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Co., and each of them, one citation was actually personally served on one of the partners, T. L. James, President of T. L. James & Co., Inc., at his domicile at Ruston, La., and the other was personally served on Gordon Walker, superintendent on the job of Mr. Keliher. It is also observed that no personal judgment is sought in the present proceeding.

"In view of this situation it is obvious that the said partnership was properly cited. Authorities.

■ "1. Stanley v. Jones, 197 La. 627, 2 So.2d 45, ext. p. 48, citing authorities including: 'In City of New Orleans v. Walker, 23 La.Ann. 803, this court declared: "A want of citation is cured by the appearance of defendant in the suit for any other purpose than to allege the want of citation." '

■ "2. By appearing to except to the jurisdiction defendant waives the question of improper citation. Godchaux v. Texas & P. R. Co., 151 La. 955 [92 So. 398]; Brannin v. Clements [La.App.] 142 So. 621.

■ "3. O'Brien v. Delta Air Corp., 188 La. 911, 178 So. 489, at page 490: 'Inasmuch as no evidence was offered in support of the defendant's exception to the jurisdiction of the court, in this case, the question

of jurisdiction depends upon the allegations of the plaintiffs' petition.'

■ "4. Courts should see that each exception should be made to perform the function properly appertaining to it and not be allowed to have substitute for it. Succession of Thompson, 191 La. 480, 186 So. 1.

■ "5. Service on one of members of partnership is sufficient to bring partnership into court: Klotz et al. v. Tru-Fruit Distributors et al. [La.App.] 173 So. 592; Cornille & De Blonde et al. v. R. G. Dun & Co., 143 La. 1045, 79 So. 855; Acts 1918, No. 179, § 1; and 1932, No. 48, § 1 (see especially '(4)' and '(12)'.

"6. See also the following: Underwood v. [Brook] Mays & Co. [La.App.] 146 So. 503; Dennistoun et al. v. Debuys et al., 6 Mart., N.S., 48; Posey v. Fargo, 187 La. 122, 174 So. 175; Phillips v. Paxton et al., 3 Mart., N.S., 39; J. P. Barnett Co., Inc., v. Ludeau, 171 La. 21, 129 So. 655.

■ "As to the exception to the jurisdiction ratione materiae, counsel state in their brief: 'The exception to the jurisdiction of the court ratione materiae was filed by us because at the time we were not clear as to whether or not plaintiffs intended to charge that the National Labor Relations Act had any application to the situation alleged by the plaintiffs to exist.'—'Since at this time it seems clear that the plaintiffs are not seeking to invoke the provisions of the National Labor Relations Act, we shall not discuss any further exception to the jurisdiction ratione materiae'.

■ "According to the brief of counsel for exceptors, the exceptions of no right of

action and no cause of action are predicated upon the assertion and assumption that the partnership was not sued. However, it appears from the petition and prayer thereof that the said partnership was sued herein.

"Therefore, in view of the authorities above cited and for the reasons stated, it is the opinion of the court that the pleas to the jurisdiction of the court ratione personae and ratione materiae, and the exceptions of no cause or right of action should be overruled, and judgment is rendered herein accordingly." See, also, Iddle v. Hamler Boiler & Tank Co., 132 La. 476, 61 So. 532, and State ex rel. Brenner v. Noe, Gov., et al., 186 La. 102, at page 107, par. 2, 171 So. 708.

### On the Merits.

"On March 4, 1941, the Louisiana Highway Commission or Department of Highways entered into and executed a written contract with T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Company, a partnership, for the erection of a bridge over the Morganza Spillway Project in the Parish of Pointe Coupee, Louisiana, all as alleged in the petition herein.

"Apparently, from the beginning there were employed on this project non-union men as well as some who were members of union crafts of the Baton Rouge Building Trades Council which is affiliated with the American Federation of Labor. And a short time after this work was commenced charges of discrimination against union labor were preferred against the said management on this job and filed with the National Labor Relations Board and, as a result thereof, said board requested the contractors, T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Company, to meet with its Mr. Parker in Baton Rouge, Louisiana, at the office of Mr. Prescott Foster, the chairman or director of the Louisiana Highway Commission. As a result of this meeting, the management agreed to employ the two men who had made the complaint and in whose behalf the Baton Rouge Building Trades Council had participated.

"After the matter before the National Labor Relations Board was disposed of, as aforesaid, Mr. Weaver, the agent and authorized representative of the Baton Rouge Building Trades Council, at a meeting or conference in King Hotel, Baton Rouge, Louisiana, asked Mr. Keliher and Mr. Bill James, said management or contractors, to negotiate a closed shop agreement on the project mentioned above. Mr. Keliher was in a hurry to return to Little Rock and he and Mr. James designated Mr. Walker, the superintendent on the job, to handle these negotiations. And in the presence of Mr. Keliher and Mr. James, Mr. Walker, for the sole purpose of negotiating a closed shop on said project, agreed to meet with Mr. Weaver on the job the next afternoon at two o'clock. To keep said appointment Mr. Weaver and representative business agents of the different crafts of the Baton Rouge Building Trades Council drove out there and at the designated time met Mr. Walker. As to the result of this meeting there is the following undisputed testimony of Mr. Weaver: 'Mr. Walker told us as represent-

ative of Mr. Keliher and Mr. James that they were satisfied the way they were and they had nothing to talk about, that they were not in any mood to negotiate any kind of agreement, and they dismissed us.'

"At this time, according to the undisputed testimony of Weaver, pressure was being exerted upon him from an element of local people around Lottie, members of his own organization, and of the pile drivers, whom he represented, 'to do something about the condition which existed at that time on this project', Weaver further said that knowing that a call meeting and a strike vote with reference to this project were inevitable, he went to Prescott Foster and informed him that the Baton Rouge Building Trades Council representing at that time sixty per cent in their efforts to get 'the laboring men's viewpoint on that job had had the door completely shut in our faces by management.'

"Because of this situation both Mr. Foster and Mr. Weaver requested Governor Sam Jones to call management and the Baton Rouge Building Trades Council together to negotiate an agreement that would be suitable to both so that the work on this project could be done without strife and struggle between management and labor. And at about this time there was a conference or meeting attended by Commissioner of Labor Harvey, Director Prescott Foster of the Highway Commission, Arthur Hammond, attorney for the Highway Department, and representatives of the various crafts affiliated with the Baton Rouge Building Trades Council. As testified to by Mr. Harvey, 'in that meeting it was brought to the attention of the director of the Highway Commission that certain discriminations were existing on this particular project, and the Building Trades Council were asking the officials of the State of Louisiana to find some way to correct or eliminate these discriminations. I was called to Washington immediately after that and on my return about July 20th, I was instructed by the Governor to call a conference between the employer, employees and the labor representatives. That conference was called for 10 a.m. at the Governor's urging, at the State Capitol.

"That was on July 22 at 10 a.m. That was the first conference or exchange of views. I had to tell you what happened prior to that, because that is when I came into the picture.

"Now, at this first conference held at the State Capitol on July 22, 1941, as aforesaid, William James and Gordon Walker represented the contractors or management, Jay Weaver represented the Baton Rouge Building Trades Council. There were present also Governor Jones, Prescott Foster, A. P. Harvey, Arthur Hammond and representatives of various union crafts. Governor Jones opened the meeting, stated that it was not within his province to make recommendations to either side on the one question for consideration, a closed shop condition on the project mentioned, expressed the hope that strife would be avoided and the parties would get together, and then retired to his office after requesting the Commissioner of Labor, A. P. Harvey, to preside. At the outset, Mr. James stated

that only Mr. Keliher or Mr. Walker could properly act with authority in the matter of the formulation of a labor policy on this project. After some discussion it was decided that Mr. Keliher should be brought into this conference and an attempt was made immediately to communicate with him by telephone at Little Rock. Mr. Keliher was finally contacted and Mr. Prescott Foster received a telegram from him in which he stated that he would be in Baton Rouge the next morning. This conference or meeting then by agreement recessed or adjourned, with the understanding that all participants therein would meet at 10 o'clock the following morning or upon the arrival of Mr. Keliher, who would then be present.

"On July 23, 1941, as agreed, a second conference was held by the participants in the first meeting with Mr. Keliher also in attendance. Prescott Foster, who remained throughout the first meeting was called out a few minutes after this conference began. The attitude of Labor and Management on this occasion is shown by the following undisputed testimony of Mr. Harvey: 'Well, in my observations made during the conference the demand of labor for a closed shop on that project was the paramount demand. Mr. Keliher did not oppose that demand exactly, as a demand, but he did inject the question of the retention of the men that were on the job. That was his greatest concern, and not the matter of wages or the other conditions; as he said, the other matters didn't amount to a tinker's damn, so far as they were concerned in a money way.' And in commenting on the result of this second conference,

Mr. Harvey said: 'The result was that there was a great deal of discussion about the job and the discriminations that existed on it, but the important part of it, or the important result was that Mr. Keliher requested that he be given an opportunity to go back to the job and discuss the matter with his employees there as to whether they would agree to closed shop conditions or not.' (P. 88.) In testifying with reference to this conference, Mr. Keliher stated that Weaver represented to him that a majority of the employees on the project wanted to join the unions and Keliher among other things said: " * * * that if as had been stated, they were ready to strike and the job was ready to be closed down, why, naturally, anything that I could do on behalf of management to find out from our employees just what were their wishes, I would be glad to do that, but that until I had done that I couldn't speak for them. * * *' (pp. 149–150). And in this connection Mr. Keliher gave the following testimony: 'Well, it was finally agreed that in order that the employers might have an opportunity to gain some first hand knowledge regarding the attitude of our employees, I undertook to go out and find out * * * poll them and find out what were their wishes in the matter; and that, as I understood it, was agreeable to all present.' We adjourned then and they gave me until 2 o'clock the next day. (pp. 150, 151).

"The third conference was held on July 24, 1941, at 2 p.m., pursuant to the said agreement made to allow Mr. Keliher and Mr. James to ascertain the attitude of said employees as to a proposed closed shop

agreement, as stated above. Mr. Keliher stated in this meeting that he had gone to the job and called all of the employees together in a group 'and generally speaking, put the whole thing in their lap.' (p. 151.) He said he told his men that 'in the light of what I heard yesterday from the union representatives alleging that they represented a bunch of you fellows, we want you to tell us what you want; and you decide it for yourselves without any regard to what you think Mr. James or I might prefer.' (p. 151) Mr. Keliher then explained how he had the clerks from his office distribute ballots to the employees,— concerning what Mr. Keliher says he reported to the conference as to what occurred after the distribution of the ballots, he and Mr. Weaver differ. Mr. Keliher says he informed the conference that he told the employees 'if you want to join the union, write yes; and if you don't want to join the union, then write no. If the majority of you want to join the union and the management thinks it advisable to make a closed shop on the job and you want to join the union under these circumstances, put a check on your ballot.' The result of the balloting as testified to by Mr. Keliher, was, of the skilled labor, 18 voted yeas, 73 voted no, 71 checked; of the combined vote, 39 voted yes, 106 voted no, and 93 checked. (p. 152.)

"Mr. Weaver's version of what Mr. Keliher reported is as follows: The votes, according to Mr. Keliher's own statement in our negotiation meeting was put to the men this way: You men who want a closed shop vote 'yes'. There was 39 straight votes of yes. 'Now', he says, 'you men who do not want a closed shop but if we agree to a closed shop are willing to join the union, put a check mark behind your "no". Of the 106 no's according to his statement, 93 of those had a check mark behind the "no", which left 12 men on the job who voted strictly no union.' (p. 65.)

"According to Mr. Keliher's testimony the 145 employees there assembled were requested to vote either as to (1) whether they wanted to join the union and (2) whether they did not want to join the union but all employees were also asked to express themselves further by checking or not checking their ballots as to the proposition of (a) whether the majority wanted to join the union under circumstances (b) that the management thought it advisable to make a closed shop on this job. Those who checked obviously indicated a willingness to join the union under circumstances that management thought it advisable to make a closed shop agreement. The combined vote mentioned by Mr. Keliher reflects that the 39 who voted yes and 54 who voted no checked and favored a closed shop if same was agreeable to management, while 52 who voted no did not check and were against the closed shop under these circumstances. In other words, this vote shows a majority of the employees in favor of a closed shop agreement if management deemed it advisable. Weaver's version of the vote reported by Keliher also shows a large majority favoring a' closed shop agreement if entered into by management. And when Mr. James was asked the question, 'Then how many decided to go along with the company if a

closed shop was signed,' he replied, 'In the event a majority of the workers wanted to join the union, they were asked to put a check on their ballot. That is a matter of record.' He also said that 93 or 91 made these check marks and that that constituted a majority. Mr. James also admitted that they could not discuss intelligently the matter of a closed shop in conference until this vote was taken. (pp. 234, 235.)

"An argument then ensued in the conference between Keliher and Weaver over said vote. Weaver contended that the vote indicated a majority of the workers favored the closed shop agreement between management and the Baton Rouge Building Trades Council and persisted in the request for the closed shop agreement. And when Keliher differed with him in the interpretation of that vote, Weaver offered to go out on the project with Brignac, take a vote of said employees, and return with a petition of a majority of said employees requesting management to sign a closed shop agreement. Mr. Keliher would not agree to this proposal. According to the testimony of Weaver '* * * For some unknown reason Mr. Keliher objected to our doing what we allowed him to do. * * * He wanted to dictate how we were going to talk to his employees which was objectionable * * *. We did tell him that we would bring back better than fifty per cent of his employees on a petition asking him to close his shop.' (p. 33.) At this point the conference temporarily came to an abrupt end. A strike had been voted by the unions in the meantime which Weaver was obligated to put into effect. And when Weaver called to

his union associates 'come on boys, we will go and strike this job' and started to leave the conference room, Mr. James stopped him and requested that he remain for further discussion with a view of getting together with management on this job. Mr. James further testified that he was in these conferences to reach a settlement of differences and to prevent a strike on this job. (pp. 229–233.)

"At this time Arthur Hammond suggested, according to his testimony, 'let Mr. Harvey go to his quarters and make recommendations, and when he would make those recommendations they were not to be binding on anybody until either one or both of them agreed on it. That is all I know.' (p. 17.) Mr. Hammond also testified that his suggestion was that Mr. Harvey make recommendations with a view toward the parties settling their differences. (p. 21.) All parties acceded to this suggestion and Mr. Harvey went to his office to prepare the recommendations. Mr. Hammond retired from this meeting thereafter and, as he testified, the first time he read or was informed in any manner as to what Harvey's recommendations actually were, was on the trial of the present case in this court.

"This conference recessed at about 4 or 4:30 p. m. to give Mr. Harvey an opportunity to prepare his recommendations. This conference was resumed at about 5 or 5:30 p. m., and Mr. Harvey presented a written document, containing his recommendations, which reads as follows:

"July 24, 1941.

"After presiding over this conference for the past three days covering contro-

versy between the T. L. James, Kelleher (Keliher) Construction Company, joint contractors, Krotz Springs, Louisiana, spillway project, and the Baton Rouge Building and Construction Trades Council it is my observation that the disputants have not reached any satisfactory position that will bring them into agreement on the subject matter in controversy.

"This conference has reached a breaking point that all must recognize, that will produce hostilities between labor and management that will not be beneficial to the State nor to the participants in dispute. Therefore, I make the following recommendations to both participants:

"1. That the management recognize a close shop condition on this project and all adjustments as to wages and working conditions be worked out with each respective craft.

"2. That management shall maintain all present employees on the job basis and the laborers used to clear stumps and shrubbery ahead of the job will be exempt from the close shop provision. All other common laborers consisting or working along with skilled craftsmen or employed in related work to construction will be considered in the close shop provision.

"3. That the unions will take into their respective crafts unconditionally and for the duration of this project all of the present employees now employed on the Krotz Springs Spillway Project, with exceptions to the common laborers as exempted in Paragraph 2.

"4. All future employees covered by the close shop provision shall be cleared

through their respective crafts' business representative. Exemptions again to the common laborers as mentioned in Paragraph No. 2.'

"It is an admitted fact that Mr. Harvey read his recommendations to those assembled in the conference and, according to the preponderance of the evidence, he explained the reasons for each article in detail to all participants, as follows: A. P. Harvey, (pp. 91, 92):

"A. The reasons for each article was that there were in dispute certain matters in a conference for over three days; that I was asking the employer to agree to a closed shop; and in addition that the wages and working conditions governing each craft would be worked out, as I understood it, from any other information that would be available. For instance, where there were differentials in wages, some adjustment should be made. There were differentials in working conditions. There were some crafts involved on the job there who were getting time and half for Saturday work; and, according to their regulations, our men could not work for that, but would have to get double time. There were a number of situations of that sort which would have to be worked out and adjusted. That was why that was put in there, in the first article. Now, in the second article I requested a concession from the labor people, which the management rather insisted upon, and which, as I understood it, was one of Mr. Keliher's greatest concerns. That was this; he has some labor clearing stumps and shrubbery, etc., ahead of the job, and that labor would be exempt-

ed from the closed shop agreement or pro-vision. I understood from Mr. Keliher that he had a number of local people on that work—it was really common labor—, who needed the employment and who prob-ably would not be there for very long. He said they would probably go to cutting cane before very long, but he wanted the oppor-tunity of giving some people employment as long as there was any of that type of work left to be done. So I requested the unions to agree to that. The other com-mon laborers working along with the skilled trades, and which Mr. Keliher des-ignated as construction laborers, would be covered by the agreement—the skilled craftsmen and those employed in related construction work would be covered. The third article was for the purpose that in negotiations of this kind we find workers on construction projects who, on account of conduct, or for one reason or another, the unions would not permit them to affiliate them with the union—the union would not accept them. So I suggested to the un-ions that they take into their respective crafts, unconditionally, for the duration of this project, all persons presently employ-ees and now employed on the spillway, ex-cept the common laborers as covered by article 2. Now, the reason for the job basis was this: there could be no room for discussion or argument about craftsmen who could not pass the required examina-tion of the skilled crafts. He could remain on the job until it was finished. That was concession to the employer. That was a concession to Mr. Keliher. That was the reason the job basis was put in there—so that Mr. Keliher could keep his present

employees and not disrupt his organiza-tion. Now, I suggested that all future employees covered by the closed shop pro-vision should be cleared out through the respective crafts business organizations. That is article ——. Now that is the only method that can be successfully used where a closed shop agreement is in effect; and I think it is in the interest of all parties. It is a very simple matter for Mr. Walker, the superintendent on the job, to pick up his telephone and call the business agent of the carpenters, and say that he wants so many carpenters at such and such a time, or electricians, or pile driver men, or what-ever the craft may be. It avoids complica-tions for everybody. If the hiring is done at the gate the question as to whether he is in good standing; and many things of that sort; and so I suggested that they call the business agents when they needed men, just as is done on all closed shop projects or works.'

"And in the language of Mr. Harvey, 'well, after explaining the recommendations to them, just as I have done here, Mr. Keliher said that he was tired; he said that he had tramped around on the job all day and that he wanted to get some-thing to eat and rest up. He said that he wanted an opportunity to think the matter over and to discuss it with Mr. James; and that in the morning he would let us know what his decision was. We then agreed to adjourn to meet again at 10 o'clock in the morning.' (pp. 92, 93.) Mr. Harvey fur-ther testified: 'Yes, Mr. Keliher said he would take it to the hotel with him, as I understood it and talked it over with Mr. James, and that he would give us his an-

swer the next morning. Mr. Weaver, who was representing the crafts, said that he had a meeting that night with the Building Trades Council and that he would be prepared the next morning to say whether or not he would accept it' (p. 93); and in answer to the question 'Now, Mr. Keliher, the recommendations of the Commissioner of Labor were read to you for your information—Didn't you agree to give them a definite answer the next morning as to whether they would be acceptable to you?' Mr. Keliher gave the following reply: 'I did.' (p. 210.)

"Mr. Keliher and Mr. James took Mr. Harvey's written recommendations along with them and thoroughly discussed and studied the entire document that night.

"The conference reconvened at 10 o'clock on the morning of July 25, 1941. In the meeting Mr. Harvey asked Mr. Weaver whether or not he was prepared to give the division of the Baton Rouge Building Trades Council concerning the acceptance or rejection of his recommendations and he was informed that said Baton Rouge Building Trades Council the night before had agreed to accept said recommendations in entirety. Mr. Harvey made a similar request on Mr. Keliher and he said management had agreed to everything except the last proposal, or article No. 4, because he did not like the idea of having to clear all future employees through the offices of the business agents of the various unions. Then Mr. Harvey explained to him that it was the only method to keep down complications. In the language of Mr. Harvey here is what occurred: 'I explained to him that it would be much easier for Mr. Walker, his superintendent, to call the business agents of the various crafts than it would be to attempt to do the hiring at the gate; and finally Mr. Keliher said, 'Oh, all right, I'll go along with it.' At that point Mr. Weaver brought out two documents—one of them a Building Trades Council agreement, and he started to fill them out and the other was the carpenter's form of agreement covering Local No. 1098; and Mr. Keliher interrupted him right now and said, 'Oh, no; this will be the agreement that I'll sign. I don't want anything to do with that paper you have there. I will agree to this and I will sign it as an agreement, but I don't want anything to do with what you are filling out there.' (pp. 93, 94). As to this, Mr. Keliher testified as follows: 'When Mr. Weaver started pulling out his papers and presenting them to me, I said, No, that is out; you can sign as many of them as you want; but I don't want any part of them. I understand this paper—I have read it over, and we are willing to take the commissioner's recommendations and proceed along those lines.' Then upon the suggestion and insistence of Mr. Keliher that the written recommendations of Mr. Harvey be the mutual agreement between the parties, the document was accepted and signed by all the interested parties, and Mr. Harvey signed same as a witness. On this signed document containing the said recommendations of Mr. Harvey, which were accepted by all as aforesaid, filed herein, written in the handwriting of Mr. Keliher, appears the following: 'Accepted for T. L. James & Co., Keliher Const. Co. By L. J. N. Keliher'. And that Mr. Keli-

her accepted and signed the said written instrument of his own free will and because he thought it was right, fair and proper appears from his own testimony: (1) In answering question as whether he signed the agreement because of coercion by anybody, Mr. Keliher replied: 'No, there was no one in the meeting who could coerce me into anything that I didn't think was right and fair and proper' (p. 193); and (2) in answering question 'You said that nobody in the room forced you to sign it?' Mr. Keliher replied 'I did, and I also said that I didn't think there was anybody in·the room of enough horsepower to force me to sign anything.' (p. 194). And, as stated by Mr. Harvey, 'Everybody signed it in good faith. The purpose of the thing was understood by everybody, and arrangements were made for the representatives of the various crafts to go over on the job and sign up the workers in those respective crafts.' (p. 95). And with reference to the signing up of his present employees on the job, according to the undisputed testimony of Mr. Harvey, 'Mr. Keliher said that possibly two or three or four or five men would not want to join the unions, but that he would not quibble over that, and that those men would just have to go; or that they would make some other provision for them.' (p. 96). After the agreement was signed, everybody smiled and shook hands and a general happy feeling prevailed because all felt that the dispute was ended. And, according to . Mr. Weaver, Mr. Keliher, in a friendly spirit after the consummation of the agreement, said in the meeting 'You know this agreement will cost me $150,000.00.' (p. 42). And, after the conference was over and while Mr. Harvey was driving Mr. Keliher to his hotel, according to the unrefuted testimony of Mr. Harvey, Mr. Keliher commented on the additional cost resulting from this agreement and stated to him 'that he was glad the entire matter was settled, although it was going to cost him $150,-000.00 more than what he had figured·on when he submitted his bid.' (p. 96).

"In this conference at the request of Mr. Keliher it was agreed that instead of shutting down the job for the purpose of classifying or signing up all of the present employees in the various crafts at the ·same time, the business agent or representative of each craft would come on the job by·appointment one at a time for the purpose of classifying and signing up the men under his jurisdiction. Mr. Weaver representing the pile drivers and carpenters by agreement would be the first and his appointment was for the following Monday morning at 9 o'clock. Then would follow Mr. McCloskey, representing the iron workers, on Tuesday morning; Mr. Brignac, representing the engineers, on Wednesday morning, and on successive days following would come the representatives of the other crafts.

"On Monday, July 28, 1941, at 9 o'clock in the morning pursuant to said previous appointment and to execute the obligations of the unions imposed by Paragraph 3 of the agreement providing for the taking the employees unconditionally into the respective union crafts, Mr. Weaver appeared on the job with permit blanks and by-laws for each man. Mr. James was late and Mr. Keliher and Mr. Weaver indulged in friendly conversation until he arrived. Be-

fore going out on the job Mr. Keliher and Mr. James looked over the by-laws with Mr. Weaver and accepted same according to the undisputed testimony of Mr. James (pp. 227, 228). Mr. James further testified that it was agreed that the initiation fee would be payable within 60 days instead of the usual 30 days and that management would advance the $10.00 down payment on the initiation fee due by employees unable to do so. The only other change in the usual requirements was that any man ordered out to work would be paid two hours instead of usually required four hours if he is not put to work for reasons other than that it was beyond the control of management. And after some discussion pertaining to the clerical work involved in writing out permits and applications, Mr. Keliher, Mr. James and Mr. Weaver left in Mr. James' automobile to locate pile drivers and carpenters then employed for the purpose of taking them into the respective union crafts in accordance with said agreement between management and the Baton Rouge Building Trades Council and its affiliated crafts. As to the attitude of the parties mentioned at this time, Mr. Keliher states: ' * * * In other words we were all there together pursuant to the understanding that had been reached, and I think there was a general presumption of good faith all the way round.' (p. 163).

"Mr. Keliher, Mr. James and Mr. Weaver first contacted the pile driver crew. Mr. Keliher was the spokesman. He did not tell the pile drivers that Mr. Weaver, Mr. James and himself were contacting them for the purpose of carrying out a written contract signed by them providing for the taking into the union unconditionally and with wages and other requirements to be adjusted to meet union standards. He said nothing about this agreement, told his employees that they could sign up with Mr. Weaver if they so desired, but he emphatically warned them that if they did their pay would be about $12.00 or $13.00 less per week since he would discontinue work on Saturdays because of union requirements of double time pay instead of time and one-half. Weaver then and there protested to Mr. Keliher and told him he was breaching the agreement which he had signed.

"And in this connection it is observed that Mr. Keliher's statement to his employees of his inability or unwillingness to pay double time on Saturday cannot be reconciled with: (1) Mr. Keliher's statement in the first of said conferences to the effect that his chief and sole concern was the retention of his present employees and that the matter of wages did not amount to a tinker's damn. (pp. 87, 88). (2) Mr. Keliher's agreeing to and signing the recommendations prepared by Mr. Harvey after Mr. Harvey explained that the words 'all adjustments as to wages and working conditions be worked out with each respective craft, etc.,' mean that those who were getting time and half for Saturday would have to be paid double time for Saturday under union regulations. (p. 91). (3) Mr. Weaver's uncontradicted statement that Mr. Keliher had agreed in conference at the State Capitol to pay the union requirement of double time instead of time and half on Saturdays. (p. 48). (4) Mr. James' testimony that he and Mr. Keliher had read the by-laws of the union crafts represented

by Mr. Weaver and accepted same. (pp. 227, 228). (5) Mr. Keliher's statement at the last conference and to Mr. Harvey when he was driving Mr. Keliher to the hotel that he was glad the entire matter was settled, although it was going to cost him $150,000.00 more than what he had figured when he submitted his bid.

"Mr. Weaver wanted to leave the project then and there and return to Baton Rouge, but under protest finally concluded to go along with Mr. Keliher and Mr. James to the carpenters, to whom Mr. Keliher addressed practically the same remarks that he had made to the pile drivers. What later and finally occurred may be seen from the following testimony of Mr. Keliher (p. 165): 'A. Yes, shortly afterwards Mr. Weaver and Mr. James and myself got back to the office some man—some spokesman for the carpenters said, "Well, we have talked this over and we are all right the way we are. If we go into the thing we have got to lose Saturday and the way we are now we get in the day," etc. * * *' (p. 166.) 'A. Well, right after the pile crew came up and said, substantially the same thing, Mr. Weaver said, well, suppose we get the Saturday rate changed,' or something to that effect, 'suppose we get it adjusted so that you could work for time and a half what about that?' And someone replied, 'Well, when you get all that done come back and we will talk some more about this business.' (p. 200.) 'A. * * * as soon as I told them that this would necessarily eliminate the Saturday work, because of the double time provision in the union contracts for Saturday work—some of them snapped right back and said 'Then

we stand to lose $13.50 a day for each Saturday, that ends it right there.'

"Obviously the employees on the job did not hesitate to sign up with Mr. Weaver on account of the dues which must necessarily be paid by everyone who joins a union or any similar organization. They were hesitant because Mr. Keliher emphatically told them that they would lose about $13.50 per week on account of the union requirement of double time for Saturday—a position which Mr. Keliher had taken for the first time and a position which cannot be reconciled with the previous actions taken and statements made by Mr. Keliher in the various conferences or meetings mentioned as shown above. Naturally, Mr. Weaver was dissatisfied on acount of his failure to receive the proper co-operation of Mr. Keliher concerning the agreement which they had all signed and he felt and stated that management had breached its contract. Weaver left after having Keliher and James agree to meet him at Mr. Harvey's office the next morning.

"Mr. McCloskey was away from Baton Rouge on business on Monday and, not knowing that anything had gone wrong, appeared on the job Tuesday as per agreement and was informed by Mr. Walker that 'there was no contract and nothing to talk about.' Mr. Brignac had heard about the situation and felt that it was useless for him to go there to the project on Wednesday as agreed.

"Mr. Keliher, Mr. James, Mr. Weaver, Mr. Brignac and Mr. McCloskey met with Mr. Harvey at his office at about 9 o'clock the following morning which was on Tues-

day. And according to Mr. Keliher's testimony, when Mr. Weaver asked Mr. Harvey for an interpretation of the agreement, Mr. Harvey replied: 'I thought that Mr. Keliher would go out there and close that job out as a closed shop operation.' (p. 167.) And, when he was asked whether at this particular meeting Mr. Keliher's position was different from that taken by him in the conference which resulted in his signing of the said recommendations, Mr. Harvey replied: 'Certainly, it was different. It was directly contrary to everything he had finally agreed to at the preceding conferences; he just didn't want to talk about anything any further.' (p. 90.) In the meantime, Mr. Weaver obtained authorization to agree for time and a half instead of double time pay on Saturdays provided Mr. Keliher recognized the agreement—which fact was not communicated to Mr. Keliher because he persisted in his opposition to the contract.

"Then Mr. Keliher came to the Governor's office on August 1, 1941, at the request of the Governor who was interested in having a satisfactory settlement of this matter. Mr. Harvey was present at this meeting also. On this occasion Mr. Keliher stated that he was not willing to meet with Mr. Weaver, and, as Mr. Harvey testified 'I understood him to say that negotiations would be futile, but he did say that they were not going to have his men belong to unions or have him say that they belong to the union; and he said that nobody could make him do it.'

"And during the course of the trial of this rule counsel for plaintiffs asked Mr. Keliher the following question: 'Have you any objection right now to allowing the representative of labor going out on that job, free and unmolested, and canvassing those men to see whether they want to take a vote on joining the unions or not?' After much evasiveness, Mr. Keliher made a very lengthy statement in reply, of which the pertinent portions are: 'Now, I don't propose to have these union representatives or any bunch of outsiders messing around that job out there.—and so far as I am concerned we have settled the matter.' (pp. 186, 187).

"Now the written instrument in controversy has separate and distinct provisions relating (1) to present employees and (2) to future employees. And the agreement as to future employees is not a proposition to be determined by the present employees and is a matter in which only the management and the Baton Rouge Building Trades Council and its affiliated crafts are interested. There are stipulations providing what class of employees come within the closed shop provision and what class of employees are exempted from this provision. This also involves only management and the Baton Rouge Building Trades Council and its affiliated crafts, the parties to said agreement. It is, therefore, obvious that the closed shop provisions at least to the extent mentioned do not depend in any way upon the concurrence of or even upon any consultation, meeting or conference with the then present employees of said project. And as to the present employees, said agreement did not contemplate or provide for the discharge of any of them. On the contrary it is stipu-

lated that 'The management shall maintain all present employees on the job basis, etc.' and it is further provided: 'That the unions will take into their respective crafts unconditionally and for the duration of this project all of the present employees now employed, etc.' And in this connection the words spoken by Mr. Keliher at the time the agreement in question was signed should be remembered, which are, according to the undisputed testimony of Mr. Harvey, 'that possibly two or three or four or five men would not want to join the unions, but that he wouldn't quibble over that, and that these men would just have to go; or that they would make some other provision for them.' And it is also recalled that Mr. Keliher signed this document after conferences prior to which he had ascertained the attitude of his employees and after Mr. Keliher had reported to the conference a vote which according to the preponderance of the evidence indicated that at least a substantial majority of the employees would follow management with reference to the above agreement.

■ "In discussing the writing in question, Mr. Keliher testified that he and Mr. James admitted that the first paragraph was correct and that the second paragraph, which recites that the 'conference had reached a breaking point which would not be beneficial to any of the participants to the dispute', was also a true statement. Mr. Keliher further said: 'Now, when we got to the first numbered paragraph (1) —we read it this way—that the management would recognize a closed shop condition * * *.'. He then stated that their un-

derstanding was (1) if they agreed to this as a basis of future discussion that would convince the participants that they had no prejudice against union labor, and (2) if their employees on the job wanted a closed shop they would have no objection. In this connection it is noted that the first numbered paragraph in part reads 'That the management recognize a closed shop condition, etc.' and the word would is not used and does not appear before management as Mr. Keliher incorrectly stated in his testimony as shown above. Then Mr. Keliher's comment that the signing would show that he and Mr. James were not prejudiced against union labor means nothing from the standpoint of interpretation, understanding and meaning of the paragraph mentioned. His second explanation to the effect that numbered paragraph (1) should be taken cognizance of only if his employees wanted a closed shop condition is not consistent with the admitted fact (a) that he did not show the document to said employees or tell them that he had signed same and (b) his explaining the failure to do so by testifying that 'In the first place I didn't think that it has any bearing on it or anything to do with it. In the second place that was something between us and the State officials and the labor crowd whereby we were to go on and continue our discussions with them.' (p. 191.) It is observed also that Mr. Keliher's said explanation is silent on and ignores the fact that the closed shop condition mentioned in numbered paragraph (1) applies to future employees and involves an agreement as to what class of employees was included within the

closed shop provision,—matters in which the present employees are not interested in any manner whatsoever. Mr. Keliher then stated that on the point of adjustment of wages and working conditions they agreed 'to try to work out something in the various crafts because some of our scales did not jibe with the scales which we believed a closed shop would require.' Then Mr. Keliher said, "Now as to paragraph 2, where reference is made to maintaining all present employees on the job—I had no intention of discharging anybody, etc.' In the language of Mr. Keliher, 'Now with regard to paragraph 3, where the unions said they would take every man on the job into their respective crafts unconditionally, why, that is what the argument was over all the time.—That according to the recommendations, took care of the present employees, which was our principal concern—our vital concern.' And as to future employees, Mr. Keliher stated 'I don't see where it would be worthwhile to discuss this angle of it.' Then in his final comments on said written instrument, Mr. Keliher said: 'Now, we accepted the whole thing in its entirety—not any one paragraph or two paragraphs—but we swallowed the whole thing as an agenda under which to continue these meetings; and the only reason we did accept them was to show difference (deference) to the state officials who were there asking us to stay in the meetings, our good faith and willingness to discuss the problem with them. We participated in difference (deference) to state officials.' (Brackets ours.) This statement of Mr. Keliher is an admission by him that he accepted every paragraph

in the written agreement and his assertion that the acceptance involved future discussion and acceptance is contrary to his previous explanation, or theory that the various provisions would have no meaning or effect except and unless his present employees desired a closed shop. And an agenda signifies matters for discussion in the future before acceptance. Therefore, since the acceptance and signing of said written instrument settled the entire dispute and there was nothing further to be discussed, Mr. Keliher's assertion that the written agreement constituted an agenda for future discussions is untenable. And Mr. Keliher further discredits the agenda theory by his conduct in considering the entire matter closed after what transpired between management, Weaver and the said employees, pile drivers and carpenters on Monday, July 28, 1941. Surely, the above mentioned testimony of Mr. Keliher as hereinabove discussed, is very unsatisfactory and from the standpoint of proof should not be accorded any probative value affecting the contents of said written instrument and the contention of plaintiffs herein.

"Mr. James' discussion of the provisions of the written instrument is very brief and incomplete. He said 'We accepted these recommendations, discussed rather that we would accept these recommendations in the light that they had been offered and recommended by Mr. Hammond, of course, understanding that they were the recommendations of Mr. Harvey.' Now, it is an admitted fact that Mr. Hammond was not in the meeting when the said written rec-

ommendations were presented by Mr. Harvey and Mr. Hammond did not know what provisions the recommendations contained until the trial of the present rule, and, therefore, Mr. James' statement that their acceptance of the recommendations was predicated on an offering and recommendation of same by Mr. Hammond cannot be correct. However, it is recalled that prior to the presentation by Mr. Harvey of his recommendations and the acceptance thereof, Mr. Hammond was present and did suggest to the participants in the dispute that Mr. Harvey be permitted to prepare recommendations which would become binding only upon their acceptance. Mr. James further said: 'We figured, of course, that the first clause, or the first sentence, or first line (meaning first numbered paragraph) could not be read, and then the discussion stopped and the balance of the terms of this procedure would, of course, would have to be carried out before the first line was put into effect.' In other words, Mr. James said that the part of the agreement reading that management recognizes a closed shop condition on this project is meaningless and 'could not be read' and 'Meant provided all adjustment, and so forth and so on, and provided the unions take into their respective crafts all the men, etc.' (p. 217.) This is the extent, nature and purport of the comments by Mr. James relative to the written agreement and the acceptance thereof, and it is very apparent that this testimony has no probative value.

"There are also other contradictions in the testimony of Mr. Keliher and Mr. James and there are instances of inconsistency between their testimony and their conduct or actions in regard to the matter in controversy. In the first conference attended by Mr. Keliher he said substantially that it was not a question of money or wages with them, but their sole concern was the retention of present employees. Yet, on the other hand, after the agreement had been accepted and signed we find Mr. Keliher telling his employees that management could not afford to pay them double time on Saturdays. Despite the fact that Keliher refused to meet in conference before talking to his employees and had reported to the meeting that he had ascertained the attitude of his men toward joining the unions, yet we note that Keliher in commenting on his remarks concerning $150,000.00 made subsequently and after the last conference stated 'you will understand that I didn't know how my men would view this proposition that they join these unions—I didn't know what their attitude was, etc.' (p. 173.) At one point in his testimony Keliher said he was in these conferences 'with a view, or with the idea in mind of satisfying the state officials, yes' in answer to the question, 'Well, you were sitting in with them with a view of accomplishing something?' (p. 197.) And then we find him contradicting himself as follows: 'I didn't say that I don't think you understood me to say that. I said that I went into them with the object in view of trying to find out what it was all about and not for the purpose of satisfying the state officials.' (p. 198.) And after testifying in effect that they did not know what the demands of the unions were before the conference started, Mr. James then

said, we did know the union demands before the conference started,—and then on further cross-examination admitted that maybe he was crossed up in his testimony. (p. 233.) And despite Mr. Keliher's assertions that he believed in treating his employees like free American citizens and that his men were opposed to joining the unions yet we note that:

"(1) Mr. Keliher did not announce to his employees the result of their vote taken by him and Mr. James on the occasion mentioned above. (2) Mr. Keliher did not tell his employees, especially the pile drivers and carpenters that he had signed a contract with the unions providing for a closed shop condition on the project—despite his assertions that the contract would be made operative only by the approval of his employees. (3) Mr. Keliher would not accord the unions the right of taking the votes of his employees in their own way— a privilege which management had availed itself of. (4) And during the trial of this rule, Mr. Keliher would not agree to accept the offer made to him in open court by the Baton Rouge Building Trades Council to take a fair vote of the employees to ascertain their attitude toward the said written agreement.

"And there are certain other significant facts that cannot be overlooked. There were some employees belonging to the unions before the present controversy arose and there is some evidence tending to show that there were wage increases on this project after the work started resulting from the influence of the unions. Then Mr. Keliher admitted that some

of management's scale of wages were below the standards which the said closed shop agreement would require. (p. 158.) Mr. Brignac's testimony to the effect that there are now employees on this job getting 35 or 40 cents per hour who would get $1.12½ per hour under the said written agreement, stands unrefuted. And there is the undisputed statement of Mr. Mc-Closkey that most of the iron workers had joined the union about the time of the trial of this rule and he was assured that the few remaining would join. There is Weaver's unrefuted testimony to the effect that he held meetings at night with the employees on the job in question and knew that most of these workers wanted to be taken into the unions. And there is Keliher's report on the votes of the employees taken by him and Mr. James before they would go into any conference with the Baton Rouge Building Trades Council, showing that a large majority of said employees agreed to join the unions if management considered it desirable to make a closed shop agreement with the Baton Rouge Building Trades Council. We note also the willingness of plaintiff and unwillingness of defendant during the trial of this rule to take a fair vote to ascertain the wishes of the said employees in the premises and abide by the result thereof. Then the evidence showing that the said employees, when Mr. Weaver was on the job to sign them up as stated above, hesitated only because Mr. Keliher, who was present, and assuming a contrary position from that taken by him in conferences which resulted in said written agreement, told said employees if they joined the unions

he would not let them work on Saturdays and they would thus lose $12.00 or $13.00 each week—a matter which the record shows would have easily been settled to the satisfaction of all if Mr. Keliher had co-operated in accordance with the agreement which he had signed and had not used the occurrence for which he was responsible as an excuse to regard the written agreement as a mere scrap of paper.

"Now, when you consider all these facts hereinabove mentioned in this paragraph, it is certainly logical and reasonable to conclude that the preponderance of the evidence herein shows that the so-called present employees desire to be affiliated with the unions, that they would have signed up with Mr. Weaver on the occasion mentioned if Mr. Keliher had co-operated in accordance with the written in-instrument and had not interfered and taken a position on wages contrary to that which he had agreed to, and that there is a very strong probability that said employees will sign up with said unions under the terms of said written instrument whenever an opportunity is afforded them to do so without interference from management. This conclusion is inevitable especially when we consider that the evidence shows that it would be to the interest of said employees on said project to become affiliated with said unions and receive the benefits under the said contract and when we take cognizance of our experience that in such matters interest, benefit and gain generally influence the conduct and action of human beings.

"It is my opinion, therefore, that there was mutuality of agreement and that the said written recommendations made by Mr. Harvey and accepted and signed by all interested parties, set forth the terms of the contract between the parties. To hold otherwise would be to disregard and ignore the plain and unambiguous language used in said written instrument, the evidence in this case, the signing and writing of said written recommendations of the words 'Accepted for T. L. James & Co., Keliher Const. Co., by L. J. N. Keliher,' the education and intelligence of Mr. Keliher and Mr. James, the admitted understanding and knowledge of Mr. Keliher and Mr. James of the meaning of the words closed shop and their experience (especially Mr. Keliher's) relating to closed shop contracts. And this contract is not unilateral in character and without consideration because the Baton Rouge Building Trades Council and its affiliated crafts, in consideration of the said agreement withheld and did not put into execution a strike order that had already been voted by them, and under said contract became obligated to furnish to management competent workers promptly upon request.

"And, as an alternative defense, it is asserted that the contract is contrary to public policy in that its enforcement involves the proposition of the present employees on said project becoming members of the plaintiffs' union by compulsion and without their consent. In dealing with this question we must confine ourselves to the facts of the present case and cannot indulge in the consideration of factual situations that may possibly exist in other hypothetical cases. In doing so we must take cognizance of the terms of the said

written instrument wherein it is stipulated that (1) 'That the management shall maintain all present employees on the job basis, etc.' and (2) 'That the unions will take into their respective crafts unconditionally and for the duration of this project all of the present employees now employed, etc.' It must also be remembered that management accepted and signed the said written instrument containing the two quoted provisions just mentioned after ascertaining the attitude of the present employees prior to entering conferences resulting in the confection of said contract. And we must also contemplate the words spoken by Mr. Keliher at the time said agreement was signed to the effect that there was a possibility of only one, two, three, four or five of the present employees not wanting to sign up with the union, but these would just have to go or some other provision would have to be made for them. It is, therefore, obvious that even under the terms of said written instrument and the evidence herein the question of having the present employees on said project join the plaintiff union under compulsion never existed and does not now exist in relation to the execution of said contract, and that that issue is foreign to the facts of this case and the present controversy.

"It is noted also that the alternative defense just mentioned was not directed to the provision of said written agreement covering future employees on said job. In fact Mr. Keliher and Mr. James in their testimony in this case said very little, if anything, about future employees, and it is apparent that they, either intentionally or otherwise, treated the stipulation in

said written agreement pertaining to the employment of future workmen on said project very lightly—even though that provision is just as binding as the terms relating to the present employees on that job.

"The following authorities are pertinent: (1) Williams et al. v. Quill et al., Jan. 18, 1938, 277 N.Y. 1, 12 N.E.2d 547, at page 548: '* * * After long negotiations and threatened strikes, the said Transport Works Union and the defendant corporations made a contract which in this case has been attacked as being illegal because of provision No. 6. It reads: "6. The parties of the first part will not, during the term of this agreement, employ any employe in the groups represented by the parties of the second part to which this agreement applies who is not, or who does not, within one month after his employment, become and remain a member in good standing of the Transport Workers Union of America: and all present employes of the groups to which this agreement applies who are not now members of the Transport Workers Union of America shall become members within thirty (30) days of the date of this agreement and remain members in good standing." ' [12 N.E.2d at] page 548: 'It is conceded by the defendants that they do not desire in any way to interfere with the employment of the plaintiffs or those who are not members of the union, except in so far as to ask and require them to join in compliance with this contract. * * *' [12 N.E.2d at] page 549: '* * * as before stated, there is nothing in the present

case before us to indicate that any injury was sought or intended to the plaintiffs or nonunion members, but that the object of the contract and of the action of the defendant labor union is to advance its own interests and ability of its members through the closed shop, to meet on even terms their employers in present or future negotiations.' [12 N.E.2d at] page 549: 'In 1927, this court, in Exchange Bakery & Restaurant, Inc., v. Rifkin, 245 N.Y. 260, at page 263, 157 N.E. 130, 132, stated in the prevailing opinion: "The purpose of a labor union [is] to improve the conditions under which its members do their work; to increase their wages; to assist them in other ways, may justify what would otherwise be a wrong. So would an effort to increase its members and to unionize an entire trade or business. It may be as interested in the wages of those members, or in the conditions under which they work as in its own members because of the influence of one upon the other. All engaged in a trade are affected by the prevailing rate of wages. All, by the principle of collective bargaining. Economic organization to-day is not based on the single shop. Unions believe that wages may be increased, collective bargaining maintained only if union conditions prevail, not in some single factory, but generally. That they may prevail, it may call a strike and picket the premises of an employer with the intent of inducing him to employ only union labor. And it may adopt either method separately. Picketing without a strike is no more unlawful than a strike without picketing. Both are based upon a lawful purpose. Resulting

injury is incidental and must be endured." ' [12 N.E.2d at] page 549: 'This case has become the law of this state and has been followed in other instances. * * * The one reservation in this law is that the attempt to accomplish the end shall be carried out in good faith and for the declared purposes, and not through malice or ill will, or a desire to injure nonunion employees, or simply and solely for the purpose of keeping them out of work.' [12 N. E.2d at] page 550: 'If all this be lawful, what is there unlawful in negotiating with an employer to accomplish through peaceful negotiations that which the law permits to be done through strikes, which lead so frequently to disruption of business and violence? If the railroads in this instance, acting upon their own initiative, determined to dispense with the services of nonunion men, I know of nothing in the law which would prevent them from doing so; or, to put it in a different way, if the defendant employers should come to their decision that, for the good of their enterprizes they would thereafter only employ union men, I do not see how the law could prevent them from doing so, or from discharging the plaintiffs and their nonunion employees. It might be an unpleasant situation for all, but, nevertheless, one with which the law could not interfere. Recognizing this, I take it that it would not be unlawful because such a determination had been arrived at by the solicitation or request of the unions or labor organizations. And then, to go one step further, why would it become illegal if the arrangements and determination were embodied

in a contract or a written agreement with the labor organizations?

■ "2. Four Plating Co., Inc., v. Mako et al., 122 N.J.Eq. 298, 194 A. 53, at page 55: '* * * But the decisions are almost unanimous that a closed shop in a single factory is consonant with public policy and lawful. "16. A Bargains with a labor union to employ only union labor. The bargain is legal unless the union has such a monopoly as virtually to deprive non-union workers of any possibility of employment; and even in that case it is not illegal if a statute legalizes such labor unions." 2 Restatement, Contracts, § 515. "A contract between a single employer and a labor union, providing for exclusive employment of its members, is not in itself unlawful at common law or under the Federal Anti-trust Act as being in unreasonable restraint of trade or tending to create a monopoly." 41 C.J. 171.

" ' "According to the weight of authority, a contract by an employer to employ union labor exclusively is valid, at least where the restraint imposed is not unreasonable, in view of the surrounding facts and circumstances." 16 R.C.L. 426,' [194 A. at] page 55: 'The contract which the union seeks is not illegal. Is it unlawful for the union to call a strike and picket in order to induce complaint to execute the contract? Complainant argues that while an employer may, of his own free will, employ only union men, and while he may voluntarily enter into a contract with the union to that end, yet the union cannot "compel" him to do so. Of course not, Neither can it compel him to raise wages or shorten hours, or enter into any contract whatever. What is meant by "compel"? My bank "compels" me to give collateral and to pay interest at 6 per cent., but actually I exercise an option; I voluntarily agree to pay the interest and give collateral instead of going without the loan. A labor union offers an employer alternatives— higher wages, shorter hours, and a closed shop, or a strike. He weighs the situation and chooses; in a legal sense, he is not compelled. Under our law, strikes and picketing are lawful inducements; they become unlawful only when conducted in an unlawful manner, or for an unlawful object, or for an object not substantially connected with the economic well-being of the members of the union.'

■ "3. Wassertein v. Beim, N. Y.Supreme Court, March 2, 1937, 163 Misc. 160 [294 N.Y.S. 439]. A legally called and properly conducted strike does not constitute duress and any agreement between a labor union and an employer entered into to avoid or settle such strike may not be repudiated. This is an action by a labor union for injunctive relief against a threatened breach of an agreement made by it with defendants, who are employers of a large proportion of the members of plaintiff union. They signed the agreement on Oct. 13th, and both parties operated under it until Dec. 24th, when Defendants gave notice of their repudiation of its terms. Their busy season had then passed and they could then economically afford to risk a strike. The court held that plaintiff was entitled to judgment decreeing the validity of the October agree-

ment and restraining defendants from acts in violations thereof.

"4. 17 C.J.S. [Contracts] § 267, p. 650: 'Employment of Union Labor.

" 'Closed shop contracts by employers to employ only union labor or contracts not to employ any union labor are valid where they do not operate generally in the community to prevent craftsmen from obtaining employment, but are invalid as against public policy if they do so operate.'

"5. Schlesinger v. Quinto et al., 1922 [201 App.Div. 487] 194 N.Y.S. 401, at page 411: 'Therefore, when the employee, instead of resorting to force to secure his rights, an archaic method abandoned by civilized men, seeks redress in the tribunal constituted by the government to protect its citizens in their rights and redress their wrongs, it is the duty of the court to stop all individual attempts to take the law into their own hands, and compel both parties to await an orderly judicial determination of the controversy.' [194 N.Y.S. at] page 410: 'The instant case does not arise out of contract for individual employment. Two organizations, one composed of employers and the other of employees, have entered into an agreement. Each had power through the consent of its members to enter into a binding obligation in their behalf. By the constitution or by-laws of each, power is given to the organization to enforce, through disciplinary proceedings which have been demonstrated to be effective, compliance with the terms and conditions to which it has subscribed. This contract has mutual obligations binding on the parties thereto. Each party knows the ob-

ligation that it has assumed and the consequences of failure or refusal to perform those requirements. Through its control of its members it can compel performance. Under such circumstances, a decree, of a court of equity can be enforced against either party and in favor of the other. * * * An organization, having such power to require performance by individual members, can through its officers, be compelled to exercise that power. There is in this contract a mutuality of obligation, and there is also a mutuality of remedy for its enforcement.'

"6. Yale Law Journal Vol. 8, 1938, pp. 201, 202. Not only has Schlesinger v. Quinto let loose a comparative flood of injunctions in the New York court against simple breaches of collective agreements by employers, but it has also had considerable influence outside of that state. In California, Georgia, Massachusetts, Mississippi, New Jersey, Ohio and Texas such injunctions have been issued with frequent citations of Schlesinger v. Quinto.

"7. Mississippi Theatres Corp. et al. v. Hattiesburg Local Union, Jan. 6, 1936, [174 Miss. 439] 164 So. 887. The bill prayed for a temporary mandatory injunction, to be made perpetual on final hearing, requiring the employer to carry out its contract by re-employing its members. A temporary writ of injunction on the fait of the chancellor was issued and served, requiring the employers named immediately to re-employ, and to continue to employ until the cause could be heard on its merits, operators for the moving picture machine in the Rose Theatre in the city of Hattiesburg to be

furnished by the union under the contract, which was made an exhibit to the bill. [164 So. at] page 888.

"[164 So. at] page 890: 'It is now the deliberate conclusion of economists and employers of labor that collective bargaining, that is, the entering into contract for labor with employers by a union through its representatives, is helpful, and advances the general public welfare, in that boycotts, lock-outs, strikes, picketing, and attendant evils, can best be avoided by recognition of the principle. Where then would be the benefit to the union of having the principle of collective bargaining granted in name, while it is entirely without any remedy against an employer who had entered into a valid contract to employ only its members, competent, willing, and ready, and who then violates this contract? Under such conditions, the contract would be, in deed and in truth, a mere scrap of paper. The members of the union would feel contempt for the manager of a union who was thus helpless. The discipline which the union authorities enforce upon its members is thought to be beneficial to society and to the employers of labor. All of the prestige and power of the labor unions, as such, are destroyed if their contracts may be disregarded by a court of equity, leaving it without remedy.'

"8. 17 C.J.S. pp. 650, 651, Contracts, § 267. Employment of Union Labor: 'Labor unions may make contracts for exclusive employment of union men, not to create an artificial shortage in the labor market, but in order that there be no discrimination against union men, and that all the em-ployees may share the financial burden which is an incident of organization, and so as to ensure a united stand in negotiations with the employer. Thus it has been said that closed shop contracts by unions which welcome to their ranks all good men in the same line of work, who will submit to the common discipline, which are governed on democratic principles and membership in which is open, on reasonable and equal terms, to all persons of good character and of skill in the trade, are valid and not against public policy. * * *'

"9. State v. Savant, 115 La. 226 [38 So. 974, 975] 'Unlawful' does not necessarily mean contrary to law. 'Un' is a preposition used indiscriminately and may mean simply 'not' and 'Unlawful' means 'not authorized by law.' It means the infringement of the moral law, and not necessarily of the civil law.

▬▬▬ "Now, in cases of breach of contract where the parties have the power of performing their obligations under the contract, since performance is the more complete remedy it should be allowed where it is available and demanded. Such is the situation in the present controversy. Management agreed to all the terms in Mr. Harvey's written recommendations as shown above, and became bound to recognize a closed shop condition on said project in accordance with numbered paragraph 1 of said written instrument and thus was obligated not to maintain an open shop condition on said job. Plaintiffs agreed to take in their respective crafts unconditionally and for the duration of the project all present em-

ployees employed on the job at the time of the consummation of this agreement and management became obligated to cooperate and not to do anything that would prevent or otherwise interfere with Baton Rouge Building Trades Council and its affiliated union crafts in their efforts to take into the respective union crafts in a lawful manner and in accordance with numbered paragraph 3 of said written instrument, the said present employees of management on said project. Then, too, management became obligated under said contract not to hire or employ any future workers on said project except through the Baton Rouge Building Trades Council and its affiliated crafts as stipulated in numbered paragraph 4 of said written instrument. It has also been established as shown above, that management has unlawfully breached this contract, that plaintiffs are suffering substantial and irreparable injury as a result thereof and has no adequate remedy at law, that plaintiffs are unable to obtain adequate protection of their property consisting of the benefits accruing from said contract except through this legal proceeding, and that if the relief sought is denied to plaintiff the injury and resulting consequences will be more disastrous to plaintiffs and will be greater than any injury that might possibly befall said management if the relief is granted. In this connection the following authorities are pertinent:

"1. Rev.Civ.Code, art. 1926: '*Breach—Remedies.*—On the breach of any obligation to do, or not to do, the obligee is entitled either to damages, or, in cases which permit it, to a specific performance of the

contract, at his option, or he may require the dissolution of the contract, and in all these cases damages may be given where they have accrued, according to the rules established in the following section.'

"2. Rev.Civ.Code, art. 1927: '*Specific performance—Circumstances giving rise to right.*—In ordinary cases, the breach of such a contract entitles the party aggrieved only to damages, but where this would be an inadequate compensation, and the party has the power of performing the contract, he may be constrained to a specific performance by means prescribed in the laws which regulate the practice of the courts.'

"3. Rev.Civ.Code, art. 1928: '*Acts in violation of contract—Restoration of status quo.*—The obligee may require that anything which has been done in violation of a contract, may be undone, if the nature of the cause will permit, and that things be restored to the situation in which they were before the act complained of was done, and the court may order this to be effected by its officers, or authorize the injured party to do it himself at the expense of the other, and may also add damages, if the justice of the case require it.'

"4. Rev.Civ.Code, art. 1929: '*Injunction against breach.*—If the obligation be not to do, the obligee may also demand that the obligor be restrained from doing anything in contravention of it, in cases where he proves an attempt to do the act covenanted against.'

"5. Commercial-Germania Trust & Savings Bank v. Russell et al., 148 La.

334, [86 So. 831], [Gulf Refining Co. of Louisiana v. Hayne, 148 La. 340] page 346 [86 So. 891, at page 893]. 'Moreover, the only reason why the breach of any contract gives rise ordinarily only to an action in damages is that ordinarily specific performance cannot be enforced. However, performance being the more complete remedy, there can be no reason why it should not be allowed in cases where it is available and is demanded. Articles 1903, 1927, C.C. read: * * *'

"6. Youngblood v. Daily and Weekly Signal Tribune [15 La.App. 379], 131 So. 604: Specific performance of contracts rests within court's discretion.

"7. Levine v. Michel, 35 La. [Ann.] 1121, [at] page 1127: Peter Callery v. New Orleans W. Co., 35 [La.]Ann. 798; State v. Savant, 115 La. 226 [38 So. 974].

"8. Town of Leesville v. Kapotsky, 168 La. 342, 122 So. 59. Mandatory injunction will issue in enforcement of judgment or decree, or as auxiliary to prohibitory injunction.

"9. An injunction may compel a party to do as well as to constrain from doing; Borne v. Perret, 1 Rob. 342; McDonogh v. Calloway, 7 Rob. 442; Pierce v. New Orleans 18 [La.] Ann. 242; Petit v. Cormier, McGloin 370.

"10. Broussard v. Cormier, 154 La. 877 [98 So. 403].

"For the foregoing reasons, and in the light of the authorities mentioned it is the opinion of the Court that the rule issued herein should be made absolute, and that, accordingly, a preliminary injunction

should issue herein directed to Defendants, T. L. James & Co., Inc., and L. J. N. Keliher, doing business as Keliher Construction Company, a partnership engaged in the construction and erection of a bridge over the Morganza Spillway Project under said contract with Louisiana Highway Commission or Department of Highways, restraining and prohibiting said partnership, its members, agents, servants and employees from recognizing and maintaining an open shop condition in relation to the employment and use of labor on said project in contravention to the terms of the said written instrument involved in this controversy, from interfering in any manner with the Baton Rouge Building Trades Council and its said affiliated union crafts in their efforts to take into said union crafts in a lawful manner and in accordance with the provisions of numbered paragraph 3 of said written instrument all present employees employed on said job at the time of the consummation of said agreement, from employing any workers on said project after the date of the consummation of said contract except through the Baton Rouge Building Trades Council and its affiliated crafts and as stipulated in numbered paragraph 3 of said written instrument, from continuing in their employment any person, firm or corporation employed in contravention to the terms of said agreement, and from interfering in any manner whatsoever, either directly or indirectly, with Plaintiffs in their efforts to carry out and fulfill their obligations under all the provisions of said contract, and from violating in any manner whatsoever any of the following provisions of said contract:

" '1. That the management recognize a close shop condition on this project and all adjustments as to wages and working conditions be worked out with each respective craft.

" '2. The management shall maintain all present employees on the job basis and the laborers used to clear stumps and shrubbery ahead of the job will be exempt from the close shop provision. All other common laborers consisting or working along with skilled craftsmen or employed in related work to construction will be considered in the close shop provision.

" '3. That the unions will take into their respective crafts unconditionally and for the duration of this project all of the present employees now employed on the Krotz Springs Spillway Project, with exceptions to the common laborers as exempted in Paragraph No. 2.

" '4. All future employees covered by the close shop provision shall be cleared through their respective crafts' business representative. Exemptions again to the common laborers as mentioned in Paragraph No. 2.'

"And it is also the opinion of the court that a mandatory injunction should issue herein commanding and ordering defendant partnership, its members, agents, servants and employees to undo whatever has been done by them or either or any of them in contravention of the said written instrument and to abide by, follow, and observe all the terms of said written instrument and particularly the four numbered paragraphs thereof.

"It is further the opinion of the court that said writs of injunction (prohibitory and mandatory) should issue upon plaintiffs furnishing bond in the sum and amount of $5,000 with surety or sureties and conditioned as provided by existing applicable laws in respect of writs of injunction.

"And judgment is rendered herein in accordance with this opinion.

"Thus done, read, rendered and signed in open Court at New Roads, Parish of Pointe Coupee, Louisiana, on this 18th day of November, 1941."

For the reasons assigned, the judgment of the district court is affirmed at the appellants' costs.

O'NIELL, C. J., and ODOM and ROGERS, JJ., dissent.

ODOM, Justice (dissenting).

As stated in the opening paragraph of the majority opinion, "This is an action for specific performance of a contract". The so-called contract upon which plaintiffs rely is copied in the opinion written by the trial judge, which opinion is adopted in full by the majority as the opinion of this court, from which I dissent.

In March, 1941, T. L. James & Company, Inc., a private corporation organized under the laws of this state with its domicile and principal place of business in Ruston, Lincoln Parish, Louisiana, and L. J. N. Keliher, a resident of Dallas, Texas, doing business as the Keliher Construction Company, entered into a contract with the Department of Highways, represented by its director, W. Prescott Foster, for the

construction of a highway bridge referred to in the contract as the "Morganza Floodway Project", the bridge to be built in the Parish of Pointe Coupee. The contract price for the building of the structure was $3,412,292.95, the work to be completed within 500 "contract days".

Construction work was begun on the project soon after the contract was signed. The contractors brought with them to work on this project a crew of expert skilled men who were members of defendants' organization and who had been working for them some 10 or 12 years. A majority of these men were not then affiliated with any labor union. They were strictly non-union men. Much less than half of them were members of certain labor organizations, and a few of them were affiliated with certain labor unions in the City of Baton Rouge, which city is about 35 miles from where the bridge is being built in the Parish of Pointe Coupee.

In the employment of laborers to build the project, the contractors employed non-union and union men indiscriminately. The project was what is usually referred to as an "open shop job". Mr. Keliher, one of the contractors, who had general supervision of the work, testified that it had taken him a number of years to build up the organization which he had, which organization he considered a most excellent one.

There is nothing to show—in fact, it is not intimated—that the union men in the crew objected to the employment of non-union men to work on the project, or that the non-union men objected to the employ-

ment of union men. Apparently the union men and the non-union men worked together harmoniously.

The right of laborers employed on a particular project to join or not to join a labor union is not involved in this case, nor is the right of labor unions to bargain collectively an issue. The main issue involved is whether the contractors entered into a closed shop contract with the labor unions of Baton Rouge, Louisiana, represented by Jay D. Weaver.

All the testimony, including that of Weaver himself, shows that this controversy was brought on, not by the employees of the defendants, but by the Baton Rouge Building Trades Council and some 14 Baton Rouge local unions, all represented by Weaver. The testimony conclusively shows that, within a very short time after the contract for building the bridge was let to the defendants, the Baton Rouge Building Trades Council and the Baton Rouge unions, all represented by Weaver, adopted a resolution authorizing him to approach the contractors for the purpose of negotiating a closed shop agreement on the project. Clearly the idea of converting this project into a "closed shop job" originated in the minds of the representatives of the Baton Rouge unions. I quote the following extract from Weaver's testimony, found on pages 23 and 24 of Volume II of the record:

"When this job was awarded and let, the first negotiation meeting was the result of a labor board meeting. It was in that labor board meeting that I, as spokesman for the Baton Rouge Building Trades Council asked Mr. Keliher and Mr. Bill

James for a meeting to negotiate a closed shop agreement on that project in accordance with the balance of the work that was being done in our territory. * * *

"At that time and in the presence of Mr. Keliher and Mr. James, I asked Mr. Walker [construction foreman] for an appointment for the Baton Rouge Building Trades meeting with him for the sole purpose of negotiating a closed shop agreement on the project. He gave us an appointment the next afternoon at two o'clock, and that day we drove out there [to the bridge], a body of representative business agents of the different crafts, and we met with Mr. Walker. Mr. Walker told us as representative of Mr. Keliher and Mr. James that they were satisfied the way they were and they had nothing to talk to us about, that they were not in any mood to negotiate any kind of agreement, and they dismissed us."

As shown by Weaver's testimony, the negotiations for a closed shop were brought about as the result of a labor board meeting. All the testimony shows that what the labor unions wanted was a closed shop job on this project. Mr. Weaver, who represented the plaintiffs throughout, frankly admitted that a closed shop was what the unions wanted and what they started out to get. He frankly admitted that such was his purpose in seeking negotiations with the contractors and that such was the purpose of the labor unions which he represented.

Mr. A. P. Harvey, Commissioner and Director of Labor for the State of Louisiana, who was present at, and participated in, all the conferences between the contractors and the representatives of the labor unions, testified that his understanding was that the paramount purpose of the unions was to bring about a closed shop condition on this project. As shown at page 87, Volume II of the record, Mr. Harvey was asked:

"Q. But specifically what was the demand or demands of labor? A. Well, in my observations made during the conferences the demand of labor for a closed shop on that project was the paramount demand."

At page 106 of the record, Mr. Harvey was asked:

"Q. I believe you said earlier in your testimony that the paramount issue in the conference was as to whether or not there would be a closed job on this project? A. That is correct."

Mr. Harvey was then asked:

"Q. Just what does the term 'closed shop' mean, in a general way? A. Well, when an employer agrees to a closed shop condition, he then agrees to terms of employment for all employees on the job, which means that those employees shall affiliate with the respective crafts unions having jurisdiction of that particular type of labor."

Mr. Harvey further testified that, when a closed shop condition prevails on a job, non-union men are not permitted to work on that job.

It clearly appears, I think, that one of the dominant ideas in the minds of the representatives of the labor unions was financial gain for the unions. Their petition sets out that, unless the contractors are

compelled to live up to their alleged closed shop contract, the unions will be damaged from a financial standpoint. In the alternative, they pray for damages amounting to $750,000.

The testimony shows that, when non-union men join a union, they are required to pay initiation fees ranging all the way from $10 to approximately $100, and it was estimated that the average for the crew on this project would be $40 or $50 per man. The testimony shows further that each union man is required to pay monthly dues.

This suit was not brought by, for, and on behalf of the laborers on the job. The petitioners are the Baton Rouge Building Trades Council, alleged to be composed of 14 named labor unions, all of Baton Rouge, Louisiana, and the business agents of those unions. It is not alleged that any of the men employed on the job were members of any of these unions.

The petitioners are the "Baton Rouge Building Trades Council, composed of the following crafts and members, all of whom are affiliated with the American Federation of Labor" (14 local unions of Baton Rouge are mentioned by name and number), and "the business agents and representatives, for and on behalf of each of said locals, and individually, and the members of each of said locals individually, all of whom are domiciled in the Parish of East Baton Rouge, State of Louisiana, and all of whom are represented herein through their duly appointed representatives and business agent, Jay D. Weaver".

Plaintiffs alleged that Jay D. Weaver, a resident of Baton Rouge, "is petitioners' duly authorized representative and business agent, respectively", and was duly authorized to "act herein" by a resolution of the Baton Rouge Building Trades Council.

They alleged in Paragraph 5 of their petition that on July 22, 1941, the contractors and the various "labor union locals composing the Baton Rouge Building Trades Council" entered into negotiations with reference to adjusting matters of wages, hours, and working conditions "between the petitioners and the contractors", and "specifically with reference to said contractors granting a 'closed shop' agreement to the said Baton Rouge Building Trades Council and its affiliated union locals and respective members", and (Paragraph 6) that these negotiations were in the form of conferences between the contractors and the various business agents and representatives of said locals and council, presided over by A. P. Harvey, Commissioner and Director of Labor for the State of Louisiana, with the consent and approval of W. Prescott Foster, Director of the Department of Highways, and that (Paragraph 7) after approximately four conferences "an agreement and contract was proposed by the Director of Labor, which agreement and contract was satisfactory to the contractors, the representatives of Labor, and the Department of Highways, and which agreement and contract was signed by the contractors and your petitioners on July 25, 1941".

Plaintiffs alleged in Paragraph 9 of their petition that on July 28, 1941, their duly authorized agent called on the contractors at the site of the project and requested

them "to carry out and fulfill and make further arrangements to carry out and fulfill the agreement and contract which had been signed and executed between petitioners and contractors, and particularly to organize and qualify the employees then presently working on said project, as provided in paragraph 3 of the contract, into the respective crafts of the Baton Rouge Building Trades Council", in accordance with the provisions of said contract and agreement, and that (Paragraph 10) "said contractors then and there refused to comply with and fulfill the contract and agreement which it [they] had negotiated, signed and executed; * * * that said contractors then and there refused to recognize the 'closed shop' agreement and contract which it [they] had signed with your petitioners and repudiated and breached the said contract and agreement in its entirety".

Petitioners further alleged (Paragraph 11) that thereafter, on August 1, 1941, they sought and obtained a conference with the contractors, "at which time all peaceful and amicable means were stressed to emplore upon the said contractors to fulfill and comply with the terms of the agreement and contract which the said contractors had signed, and breached as aforesaid". They alleged (Paragraph 13) that the work on said project is in progress in violation of the contract, and that (Paragraph 14) the Baton Rouge Building Trades Council is composed of 14 different crafts of locals with membership totaling 3710; that its members are skilled in their respective crafts and are the most "efficient employees that can be employed or found", and that they are ready and willing "to perform in accordance with the provisions of said contract; that they are organized for the purpose of bettering not only labor conditions but to elevate the standards of work and thereby increase the prestige of their employers; * * * that they are united and organized and have business agents and representatives to secure work for their respective members and that the contractors alone openly breached said contract and agreement, * * * which has caused and is causing large damages and irreparable injury and harm to the Baton Rouge Building Trades Council and its respective unions, members and personnel".

It is alleged in Paragraph 15 that the refusal of the contractors to "abide, fulfill and comply" with the provisions of the contract "is keeping innumerable numbers of men and workers idle who would ordinarily be now employed and amounts to a loss of revenue for the respective union, and thereby jeopardizes the probability of employment of its respective members and increases unemployment among the members; that it amounts to a loss of work and revenue to the various members of the respective unions belonging to the Baton Rouge Building Council, which injuries are irreparable and damaging to your petitioners, and which damages cannot be measured by pecuniary standards".

The allegation that plaintiffs are suffering irreparable injury due to the breach of contract is repeated in Paragraph 16; and Paragraph 17 reads as follows: "That the only peaceful means of settling this controversy immediately, and the only remedy at law, is by specific performance of the above mentioned contract."

It is further alleged in Paragraphs 19 and 20 that the court should compel defendants to comply with the contract and should issue a rule nisi "commanding defendants to show cause * * * why the said contract * * * should not be complied with and fulfilled, and that said contractors be ordered, directed and commanded to comply with the provisions of said contract; that defendants should be restrained, enjoined, and prohibited from employing any person, firm or corporation in violation of the provisions of said labor contract and agreement".

In Paragraph 21 it is alleged in the alternative that, should the court decide that petitioners are not entitled to injunctive relief, "petitioners show: That it is estimated that it will take 2½ years to complete said project; that the labor will amount to over One Million Dollars on said project; that as a result of said contractors, breaching said contract and agreement entered into with your petitioners, and for the reasons aforesaid, your petitioners will suffer and are entitled to recover damages in the sum of $750,000.00".

The petitioners pray for judgment against defendants, "recognizing the validity and binding character of the contract sued upon as to all of the parties thereto"; and pray further that a rule nisi issue, directed to the defendants, to show cause why they should not be ordered and directed to abide by the terms and conditions of said contract, and "specifically ordering and commanding the said contractors to negotiate a 'closed shop' agreement with your petitioners".

They further pray that defendants, their agents and representatives, "be restrained and prohibited from performing any work, expending any money or other items for the performance of any work, or employing any persons, firms or corporation in violation of the provisions of said labor contract and agreement", in connection with the construction of said project. In the alternative they pray for judgment in the sum of $750,000.

The defendants, through counsel, came into court and admitted that they had entered into a contract with the Department of Highways to build the bridge referred to as the "Morganza Floodway Project", as alleged by plaintiffs, and that work on the project was in progress at the time the suit was filed. They admitted that they had engaged in a conference with representatives of various labor union organizations of Baton Rouge, and that the conference was attended also by Mr. Foster, Director of the Department of Highways; Mr. Hammond, attorney for that department; Mr. A. P. Harvey, Commissioner of Labor; Mr. Gordon Walker, superintendent of the work, and Mr. Jay D. Weaver.

They alleged that Jay D. Weaver, representing the plaintiffs, stated that there was considerable dissatisfaction in defendants' organization with respect to labor, and that said Weaver "insisted that agreements be signed immediately by respondents and plaintiffs for the closed shop"; that the representatives of respondents "absolutely refused to sign any agreement for a closed shop, but stated that they would be glad to

continue negotiations working toward a closed shop if the employees of the project desired a closed shop". They alleged that, in each of the conferences held, either some representative of defendants or Mr. Keliher himself, one of the defendants, "stated and in so stating voiced the attitude of all your respondents, that under no consideration would respondents enter into any agreement for a closed shop unless the employees on the job so desired;" that, after this attitude on the part of the contractors was thus definitely stated, it was declared that a vote of the employees should be taken as to what they desired, and that the conference was adjourned until the next day, and that in the meantime "a vote by secret ballot was taken of the employees on the job, and the employees by free expression of their independent will, voted overwhelmingly that they did not want to join the union".

They alleged that, despite the vote which had been taken, "Jay D. Weaver claimed that the vote was not representative and still insisted that agreements be signed for a closed shop regardless of the vote", and that both Mr. Keliher and Mr. James "flatly refused' to enter into agreement for a closed shop particularly in view of the fact that their employees had indicated that they did not want a closed shop".

They further alleged that Commissioner of Labor Harvey requested that negotiations be continued and asked that he be permitted to "draw up some kind of schedule of procedure under which some formal agreement might later be worked out", and that Mr. Harvey prepared his "recom-

mendations", and that on the following day Mr. Keliher, representing defendants, again stated to Jay D. Weaver and to Mr. Harvey, in the presence of others, "that no contract or contracts for a closed shop would be executed by any of your respondents unless the employees signified their willingness to recognize a closed shop". Defendants alleged that their representatives, particularly Mr. Keliher, repeatedly stated to all parties concerned that the contractors "had no objection whatever to all employees on the job joining unions and that if all the employees desired that a closed shop condition should exist, your respondents would be glad to recognize that closed shop condition when and if it came into existence".

Defendants do not deny that they, by and through Mr. Keliher, approved and signed the instrument prepared and presented by Mr. Harvey, which they refer to as "recommendations" and which plaintiffs refer to as a contract for a closed shop. But they deny over and over again in their answer that the instrument prepared by Mr. Harvey was intended to be, or was in fact, a contract or a closed shop agreement. They alleged that they did not understand it to be such at the time they signed it, and that, before it was signed, they repeatedly told Weaver, representing the unions, and Mr. Harvey, Commissioner of Labor, that under no circumstances would they enter into a closed shop agreement without first getting the consent of the employees on the job to a closed shop condition, which consent had not been obtained at the time the instrument was signed; that, according to their interpretation and understanding of

the instrument, its purpose was to leave the door open for further negotiations in case it should be found that defendants' employees approved a closed shop condition, and that the purpose of the instrument was to afford the employers and the representatives of the unions equal opportunity for the polling of the employees as to whether they desired that there should or should not be a closed shop.

Defendants alleged in the alternative that, if the court should decide that the parties intended by signing the instrument to enter into a contract for a closed shop, the contract was invalid and unenforceable in law for the following reasons:

"(a) The contract is unilateral in character and without consideration in that only the contractors (your respondents) agree to perform or agree to refrain from performing any act or acts.

"(b) Employees of respondents would be required, if said contract is enforced, without their consent and by compulsion to become members of the plaintiff union.

"(c) To enforce said purported contract would be against public policy and good morals and particularly against the provisions of the Wagner Act, which expressly recognizes the right of employees to join, or not to join, any union or unions, or to form any union or unions as they see fit."

Defendants alleged further that specific performance of the purported contract cannot be equitably enforced when it requires involuntary and compulsory action on the part of the employees, who did not sign the contract or consent to the contract and who were not parties to it; that the effect of a ruling ordering the specific performance of such a contract would be to force employees, who were not parties to it, to join a particular union or unions, or else lose their jobs.

The trial judge overruled each of the exceptions filed by defendants. On the merits, the court held that the plaintiffs and the defendants had entered into a valid and binding contract for a closed shop, and rendered judgment in favor of plaintiffs and against defendants. The rule nisi previously issued was made absolute, and accordingly a preliminary injunction was issued, restraining and prohibiting defendants "from recognizing and maintaining an open shop condition in relation to the employment and use of labor on said project in contravention to the terms of the said written instrument involved in this controversy", and prohibiting and restraining defendants from "employing any workers on said project after the date of the consummation of said contract except through the Baton Rouge Building Trades Council and its affiliated crafts".

Counsel for the respective sides devote considerable space in their briefs to a discussion of the various exceptions filed by defendants, which exceptions were overruled by the trial court. But, under the view I take of the case on its merits, I shall not discuss those exceptions. I think the judgment on the merits is wrong and should be reversed.

The issues involved, which clearly appear from the pleadings which I have reviewed at length, are, first, whether the in-

strument prepared and submitted to the parties by Mr. Harvey, Commissioner of Labor, and signed by them, was intended to be, and is, a valid agreement and contract for a closed shop affecting the labor employed in the erection of the bridge, and, second, whether, if it was so intended, it is binding upon the parties and enforceable under the law.

Plaintiffs sue to enforce a contract. They alleged, and their counsel now argue, that the labor organizations and the defendants entered into a contract for a closed shop condition pertaining to this project, and that the instrument prepared by Mr. Harvey as his "recommendations", which instrument was approved by the parties, evidences that contract. If, as contended by defendants, there was no such contract entered into, the plaintiffs have no case. The burden of proving that there was a contract was upon the plaintiffs. I think they failed to discharge that burden.

The testimony shows beyond question that defendants did not intend to enter into a contract for a closed shop without the consent and acquiescence of their employees, and shows beyond question also that, at the time they signed and approved the "recommendations" prepared by Mr. Harvey, they had not obtained their employees' approval of a closed shop condition.

I refer to the instrument prepared by Mr. Harvey as his "recommendations" advisedly, because in the preamble to that instrument he says, "Therefore, I make the following recommendations to both participants."

Mr. Keliher testified emphatically that, when he signed and approved the instrument prepared by Mr. Harvey, he did not construe it to mean what plaintiffs say it means; that he did not intend to enter into a closed shop agreement, and that he did not understand that the instrument was intended to evidence a closed shop contract. His testimony to this effect, corroborated as it is by the evidence and circumstances which we shall presently refer to, is convincing and must, I think, be accepted as true.

During the conferences relating to the establishment of a closed shop, Mr. Keliher stated over and over again to the labor representatives, in the presence of Mr. Harvey and others, that he would not object to a closed shop if his employees consented to such condition, but that he would under no circumstances agree to a closed shop without the consent of his men. He stated further that it had taken a number of years to build up the organization he then had, which he considered a good one; that some of his men who had been with him for 10 or 12 years were not members of any labor union—in fact, objected to labor unions—, and that he would under no circumstances agree to a closed shop without their consent because, if he did, these men would have to join the unions or be discharged, and that he could not afford to disrupt his organization by such procedure. Both Mr. Harvey and Mr. Weaver, who are familiar with labor union rules, testified that, if defendants had consented to a closed shop on the job, all their present employees who were eligible to membership in the labor unions would have to be dis-

charged if they refused to join the unions. They testified that what a "closed shop" means is that all non-union men are barred from employment. The testimony shows conclusively that the contractors were endeavoring to avoid being put in a position where it would be necessary for them to discharge some of their most valuable employees in case such employees refused to join the unions.

The testimony of Mr. Keliher that he made it clear to all parties concerned that he had no objection to a closed shop if his employees concurred, and that he would not agree to such a condition without their consent, is corroborated by that of Mr. Harvey, Mr. Weaver, Mr. Hammond, Mr. James, Mr. McCloskey, and others.

Mr. Harvey, speaking of a conference during which the Governor was present, said: "Well, the Governor had asked me to sit in and see if this thing could not be straightened out. Mr. Keliher said he wasn't going to make his men join any union unless they wanted to join of their own free will, and he said that he didn't think anybody else could make them do it."

The testimony shows that, after Mr. Keliher, who attended the conferences as a representative of the contractors, had made it clear that he had no objection to a closed shop provided his employees gave their consent, it was suggested that the conference adjourn until the next day in order to give Mr. Keliher an opportunity to go to the site of the project and there ascertain the wishes of his employees.

Mr. Keliher testified that he undertook to find out by a poll what their wishes were in the matter. He said that he got them together in a group and told them that he had had some discussion with representatives of union labor at Baton Rouge regarding a closed shop condition for the job, and that he told them that, "in so far as the management was concerned, we only had one thing in mind, and that was simply this: to maintain the organization—all of the employees who were then on the job for the duration of the job; that we had absolutely no objection to any employee belonging to any organization that he wished to join; and that we had absolutely no intention of requiring them to join any organization in order to hold their jobs or to continue in our employ. I told them that we were prepared to do whatever they wanted to do, and, generally speaking, I put the whole thing right in their lap". He said he told them that he wanted them to decide for themselves without regard to what he or Mr. James might prefer. He said he prepared, and the clerks delivered to the employees, ballots for the voting. He said he told the men, "if you want to join the union, write yes; and if you don't want to join the union, then write no. If the majority of you want to join the union and the management thinks it advisable to make a closed shop on this job and you want to join the union under these circumstances, put a check on your ballot". He said that, after the men had voted, the clerks collected the ballots, which showed that "Of the skilled labor, 18 voted yes; 73 voted no; 71 checked. Of the combined vote, 39 voted yes; 106 voted no; and 93 checked".

According to Mr. Keliher's poll, 18 of the skilled employees wanted to join the

unions, and 73 of them did not want to join. However, out of the 91 skilled laborers who voted either for or against joining the unions, 71 signified that, if a majority desired to join and if the management thought it advisable to close the shop, they were willing to go along with the majority and the management. The combined vote of the skilled and the unskilled laborers showed 39 wanted to join the unions and 106 did not want to join. Of these 145, 93 signified a willingness to go along with the majority if the management thought it advisable to close the shop.

When the conference was resumed on the following day, Mr. Keliher stated that his poll showed that a vast majority of his employees did not want to join a union, and for that reason he would not agree to a closed shop condition.

It is argued by plaintiffs' counsel that the poll taken by Mr. Keliher shows that a majority of the laborers were willing to join the unions, because a majority of them "checked". The employees voted by secret ballot, no one knowing what the result of the voting would be. No employee knew whether or not there would be a majority in favor of joining the unions, and their checks merely signify a willingness to join the unions if a majority so desired and if the management thought a closed shop condition was desirable. But, according to the poll, a majority did not want to join the unions. Evidently, if the men who checked had known that a majority did not want to join the unions, they would not have checked. Naturally, those who checked did not want to go against the majority and against the wishes of their employers, because to do so would necessarily mean that, if a closed shop were ordered, they would lose their jobs.

Mr. Keliher testified, and his testimony is not disputed, that a labor representative present at the conference suggested that apparently the only way to force a closed shop was to "strike the job", and that he had replied that it was all right with him, and that the conference was about to "blow up". Thereupon, Mr. Harvey, who was present, intervened and suggested that there might be a chance left to get the matter straightened out. The testimony shows that the representatives of labor objected to the methods which Mr. Keliher had used to take the sentiment of his employees, and that they wanted to find out in their own way whether or not the employees were in favor of joining the unions and of a closed shop. Mr. Keliher objected to any interference with his men by the labor representatives. Since Mr. Keliher had all along signified his willingness to consent to a closed shop in case his men so desired, the only controversy was whether the poll taken by him revealed the true sentiment of his employees. Since Mr. Keliher was satisfied in his own mind that a majority of his men did not want to join a union and since he was unwilling for the representatives of the unions to go out on the job and interview the men personally, as they insisted upon doing, a deadlock resulted. It was then that Mr. Hammond, attorney for the Department of Highways, who was present at the conference, made the following suggestion:

"My suggestion was—they were getting nowhere fast, and it would break up in a free for all—that the labor people were not

agreeable to adopting the method Mr. Keli-her had adopted, and Mr. Keliher was not agreeable to their going out there and try-ing to get them to sign up a petition. I suggested that they let Mr. Harvey discuss individually with each side what their idea was as to how they should proceed and let Mr. Harvey go to his own quarters and make recommendations, and when he did make those recommendations they were not to be binding on anybody until either one or both of them agreed on it." (p. 17) * * *.

"My suggestion was that Mr. Harvey be requested to submit recommendations of the procedure that should be adopted to get the sentiment of the workers from the labor-ers' viewpoint." (p. 20.)

It was then that Mr. Harvey prepared the instrument which was subsequently ap-proved and signed by the parties. Mr. Keliher was present and heard the sugges-tion made by Mr. Hammond. He there-fore understood that Mr. Harvey was to prepare recommendations "of the procedure that should be adopted to get the sentiment of the workers from the laborers' view-point".

Mr. Harvey himself seems to have under-stood that the disagreement was as to the method of getting the sentiment of the employees. He was asked:

"Q. Now, at the conference on the afternoon of July 24, which I understand was the date on which you prepared these recommendations, but before the recom-mendations were prepared, the only matter in dispute was how the employees would be interviewed or canvassed, was it not?

A. That was the reason for the dissolu-tion of the conference. Mr. Keliher had already done that by his method and when the union wanted to go out on the job and use their methods, guaranteeing him that they would bring in petitions with his workers' names signed to it, why, he ob-jected to that; and that was the principal thing that broke it up."

Mr. Kelliher testified that, when he signed the instrument, he had no idea that it was intended as a contract for a closed shop. He said that, in reading the instru-ment prepared by Mr. Harvey, he con-strued Section 1 thereof with Section 3. He pointed out in his testimony that Section 1 provides "That the Management recog-nize a closed shop condition on this pro-ject", and that Section 3 provides "That the Unions will take into their respective crafts unconditionally and for the duration of this project all of the present employe-ees". He said that he understood Section 1 to mean that the management had no ob-jection to a closed shop, which was in keep-ing with his repeated statements to that effect, and understood that his approval of this section was conditional upon his em-ployees' approval of the provisions of Sec-tion 3. In other words, if his employees approved the provisions of Section 3, they would join the unions, and the manage-ment would then agree to sign a contract for a closed shop. He testified that he did not consider his approval of the instrument to mean that he was abrogating the position which he had always taken and which he had clearly and definitely explained to the representatives of labor and Mr. Harvey, which position was that he would not con-

sent to a closed shop unless his employees were willing to join the unions and consent to a closed shop condition.

He explained further that Section 3 of the instrument went no further than to signify the willingness of the unions to take into their respective crafts his present employees, and that this section had no force or effect unless his employees were willing to join the unions and, in fact, did join. In other words, he said that he understood that the door was left open for further negotiations.

His testimony to this effect is corroborated by his subsequent conduct. It is admitted that, immediately following the agreement of all parties to sign the instrument prepared by Mr. Harvey, Jay D. Weaver, representing the labor organizations, withdrew from his pocket two documents, which he requested Mr. Keliher to sign. Admittedly these documents were formal contracts for a closed shop. One of them provided for an agreement between the defendants and the Baton Rouge Building Trades Council, and the other for an agreement between the defendants and the United Brotherhood of Carpenters and Joiners of America. The first contained the following provision: "We, the firm of T. L. James, Keliher Construction Co., agree to recognize the jurisdictional claims of the Baton Rouge Building Trades Council Baton Rouge, Louisiana, to work the hours, pay the wages and abide by the rules set up by the Affiliated Crafts in which any work of our Company is being done, and employ members of the Baton Rouge Building Trades Council only."

The second document contained a similar provision pertaining to the United Brotherhood of Carpenters and Joiners.

Mr. Keliher refused to sign these instruments and stated to Mr. Weaver that he would not sign a contract for a closed shop but would abide by the agreement which he had already consented to sign.

The fact that Mr. Weaver prepared these documents and submitted them to Mr. Keliher for his signature clearly shows, I think, that Weaver himself did not understand that the instrument prepared and submitted by Mr. Harvey was intended to be a final and binding contract for a closed shop. This conclusion is strongly indicated by a clause found in the prayer of plaintiffs' petition. Among other things, plaintiffs prayed for judgment "specifically ordering and commanding the said contractors to negotiate a 'closed shop' agreement with your petitioners".

After Mr. Keliher refused to sign the two documents presented by Mr. Weaver, it was agreed that Keliher and Weaver should go to Pointe Coupee Parish, where the men were at work on the bridge, and that the two should interview the men together. As to what was the purpose of the interview, Mr. Keliher and Mr. Weaver do not agree. Mr. Keliher says that his purpose was to find out whether his men wanted to join the unions. Weaver says that his purpose was to take them into the unions and sign them up. The fact that Keliher went with Weaver indicates that his purpose was to cooperate with the latter in finding out what the men desired to do. Mr. Weaver testified that he went to the

side of the project, and, accompanied by Mr. Keliher and Mr. James, went out to interview a pile driving crew. He said: "When we approached the pile driving crew Mr. Keliher hollered at Blackie Wright [the foreman of the crew] to shut down and bring his crew over to us. When they approached us, Mr. Keliher made the statement that this happened to be Mr. Weaver, from the Baton Rouge Building Trades Council, that we had been in negotiation, and that it was the attitude of organized labor that this should be a closed shop job, and asked them what they thought about it. Again I blew up."

This clearly indicates that Mr. Keliher was trying to find out what his employees thought about the closed shop. If he had thought that he had already committed himself to the closed shop proposition, naturally he would have done no more than inform his men that he had done so. Mr. Weaver testified that Mr. Keliher told the men in his presence that he had no objection whatever to their joining the unions, and that all he wanted to know was what they thought about it. Weaver testified that Keliher told the men that, if a closed shop was ordered, they would have to abide by the union rules, which prohibited work on Saturdays at the regular rate of pay, and that the management could not afford to pay double time for Saturday work, and that, if they joined the unions, the job would have to be shut down all day on Saturdays. Weaver strenuously objected to these statements by Keliher. Keliher said that he thought his men should be informed of all the facts.

As clearly indicating Mr. Keliher's attitude in the matter, Mr. Weaver, speaking of what happened when he went with Mr. Keliher to interview the men on the job, testified as follows:

"Q. What did he tell you about the contract at that time? A. He did not have a contract.

"Q. He told you that? A. Yes. He told me his interpretation of this agreement, the recommendation from the Commissioner of Labor, was that he and I would talk to the fellows and if they wanted to go into the union, all right, and if they did not, it was all right. He told them that right in front of me."

Weaver displayed a different spirit altogether. His idea was that the men had no right to be consulted as to whether there should or should not be a closed shop on the job or whether they should join the unions or not join. He testified that at the close of the day the carpenters and the pile driving crew, who were the only ones consulted that day, came in and said that they did not want to join the unions. Speaking of Mr. Keliher's attitude toward the men, Mr. Weaver testified at page 51: "He never mentioned the fact to any crew that he had signed the closed shop agreement. He did tell them if they wanted to join the union that we would take them in unconditionally."

He was asked:

"Q. You were not prevented from asking them to join? A. I was not there to ask them. I was there for the purpose of signing them up. The thought of asking them never entered my mind.

"Q. I believe you testified on direct examination that the carpenter crew while

you were out there reported that they wanted no part of the union at all? A. That is correct."

Weaver's testimony clearly demonstrates Keliher's attitude toward the men and clearly demonstrates also his own attitude toward them. Weaver's idea was that Keliher had the right to sign a closed shop agreement without regard to the wishes of his men and thereby force them to join the union or else be discharged. In other words, Weaver's attitude apparently was that an employer has a right, if he sees fit, to force his employees to join a union by signing a closed shop agreement and then telling them that he has done so.

For an employer to sign a closed shop agreement for a job on which non-union men are then employed would be wholly unfair to them, because they would either have to join the unions or lose their jobs. Such conduct would amount to coercion and would violate the provisions of the Wagner Act, which protects the freedom of employees to join or not to join a union as they see fit.

The testimony makes it perfectly clear that Mr. Keliher never intended to abandon, and did not in fact abandon, the position which he took at the beginning and which he repeatedly expressed during and after these conferences, which was that he had no objection to a closed shop provided that his employees approved such condition; that he wanted to play fair with his men, and that under no condition would he agree to a closed shop without their consent. Mr. Harvey testified that such was Mr. Keliher's attitude from the beginning to the end of the conferences.

Weaver testified that he understood that the unions had been granted a closed shop contract. Conceding that he did think so, it definitely appears that the parties misunderstood each other and disagreed in their interpretation of the instrument which they signed. This being so, there was no meeting of the minds and therefore no contract.

Paragraph 4, Article 1945 of the Revised Civil Code, which is found under the heading "Of the Interpretation of Agreements", provides: "That it is the common intent of the parties—that is, the intention of all,—that is to be sought for; if there was a difference in this intent, there was no common consent, and consequently, no contract."

Article 1798 of the Revised Civil Code reads as follows: "*Offer and acceptance.* —As there must be two parties at least to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the will of both parties must unite on the same point."

My opinion is that in this case there was no common consent, and consequently no contract for a closed shop.

Defendants' alternative defenses are that, even if it be true that the parties intended the instrument which they signed to be a contract for a closed shop, such contract is not binding and cannot be enforced by law for the reason that it shows on its face that it is unilateral in character and without consideration, and that, if defendants had attempted to create a closed shop condition without the consent of their em-

ployees, they would have acted contrary to the provisions of the Wagner Act. 29 U.S. C.A. § 151 et seq. While I think these defenses are good, I shall not discuss them for the reason that, in my opinion, there was no contract entered into for a closed shop.

I respectfully dissent from the majority opinion.